UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 8:22-cv-00462-SB-DFM | Date: | April 27, 2022 |
|---|---|---|---|

| Title: | *MetaQuotes Ltd. et al. v. MetaQuotes Software Corp. et al.* |
|---|---|

| Present: The Honorable | **STANLEY BLUMENFELD, JR., U.S. District Judge** |
|---|---|

| Jennifer Graciano | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:    ORDER GRANTING PRELIMINARY INJUNCTION**

Plaintiffs MetaQuotes Ltd. and MetaQuotes Software Corp. operate financial trading platforms and allege that Defendants fraudulently impersonated Plaintiffs to obtain payments from their customers. The Court issued a temporary restraining order (TRO) prohibiting Defendants from using Plaintiffs' trademarks or suggesting affiliation with Plaintiffs, preliminarily freezing the assets of some Defendants, and allowing expedited discovery. Dkt. No 18. The Court ordered Defendants to show cause why a preliminary injunction should not issue. At the request of Defendant Jian He—the only Defendant who has appeared—the Court continued the show cause hearing and held an evidentiary hearing on April 22, 2022. As stated on the record and explained in further depth below, the Court now finds that Plaintiffs are entitled to a preliminary injunction against Defendant He.

## I.    BACKGROUND

Plaintiffs MetaQuotes Software Corp. (MSC) and MetaQuotes Ltd. have developed online trading platforms, which they license to brokers and end users around the world. At the end of 2020, MetaQuotes Ltd. acquired all intellectual

property rights connected to MSC's software, and Plaintiffs have used MetaQuotes Ltd. to manage their operations since 2021, although MSC still has license agreements with some customers.  Plaintiffs share the same management, directors, and CEO, and both are headquartered in Cyprus.  They have three trademarks registered with the United States Patent and Trademark Office: "MetaQuotes Software" and "MetaQuotes," both registered in June 2015, and another trademark for "MetaQuotes" registered in January 2021.  They also have four trademarks registered with the World Intellectual Property Organization, for "MetaTrader," "MQL4," "MQL5," and "MetaTrader 5."  Plaintiffs' license agreements and methods of charging their customers are not publicly available.

     From September 2017 to December 2020, Plaintiffs provided services to UGL Exchange Ltd. (UGL), a company registered in Cyprus.  Defendant Jian He was the sole shareholder of UGL and communicated regularly with MSC regarding billing and other matters.  Those communications showed an IP address for Defendant He associated with Limassol, Cyprus, although Defendant He was in the United States for the entire time.  In December 2020, Plaintiffs became concerned about fraud and other problems at UGL.  Plaintiffs asked to meet with Defendant He, but he responded, using the email address peter@uglexchange.com, to state that he was stuck in America and could not travel to Cyprus.  Plaintiffs, through counsel, then informed UGL that they were terminating the license agreement because UGL had repeatedly breached the terms of the agreement, including by providing Plaintiffs with forged documents, misrepresenting UGL's licensing status to the public, and engaging in fraud.  Defendant He responded, again using the peter@uglexchange.com email address, to address these concerns, although Plaintiffs proceeded to terminate the license.  At the hearing, Defendant He admitted that (1) he used the name "Peter" to do business, (2) Plaintiffs asked him to meet with them in Cyprus but he declined, and (3) he signed every page of the license agreement between Plaintiffs and UGL's predecessor.  Defendant He denied that he used the peter@uglexchange.com email address or had seen the December 2020 emails produced by Plaintiffs, and he insisted that he was not involved in the running of UGL and was merely a shareholder with no right to operate the company.  Considering the documentary evidence, Defendant He's admissions, and the Court's observations of his demeanor during his live testimony, the Court finds Defendant He's denials (along with much of his testimony) to lack credibility.

     In addition to UGL, Defendant He was involved with a different company in China, Qingdao Sitong Software Co., Ltd., which Plaintiffs and Chinese law enforcement investigated for pirating Plaintiffs' software in 2017.  Defendant He

testified that he set up this company but sold his shares in October 2016, and he denies any involvement in wrongdoing that may have happened after that time. Plaintiffs were informed that law enforcement had arrested five people from the company and that the "boss," Jian He, was a criminal fugitive who had evaded arrest and escaped overseas.[1] Defendant He denies knowing about the criminal investigation, but he admits that he came to the United States in August 2017, the same month the Chinese police identified him as a fugitive, and that he has remained here since.

Tomokazu Suzu is the CEO and director of FXCA Markets Limited (FXCA), a Hong Kong company. Suzu was familiar with Plaintiffs' software and corresponded with someone who identified himself as "Peter" and claimed to represent Plaintiffs. Through "Peter," FXCA entered into a licensing agreement purportedly with Plaintiff MSC, dated June 24, 2021. The license agreement contained the "MetaQuotes" mark on every page and purported to be signed by the CEO of MSC. The licensing agreement was not genuine—it included an $80,000 startup fee that Plaintiffs do not charge and that was written in red text, which Plaintiffs do not use in their contracts. Suzu received and paid an initial invoice from "Fintech" and thereafter received invoices purporting to be from MSC. The invoices were sent from the email address support@metaquotesmt5.com—an address and domain name that contains Plaintiffs' mark but that MSC does not use—and contained Plaintiffs' marks, along with instructions to make payment to a bank account in the United States (where Plaintiffs have no bank accounts).

Meanwhile, Plaintiffs were contacted by an individual purporting to be Suzu seeking to license Plaintiffs' product for use by FXCA. The IP address used by the individual was associated with Limassol, Cyprus—like Defendant He's earlier contacts with Plaintiffs on behalf of UGL and unlike the IP address of the real Suzu, whose IP address was later recorded as coming from Taiwan. Plaintiffs executed a license agreement with FXCA and provided credentialing to allow access to Plaintiffs' software. For several months, Plaintiffs sent invoices to the person who had contacted them on behalf of FXCA and received payment on the invoices. Eventually, in December 2021, Suzu became concerned because Plaintiffs' software has some seemingly unauthorized activity. Suzu contacted

---

[1] In connection with Plaintiffs' motion for a TRO, Defendant He objected to the exhibits containing information about the Chinese criminal investigation, but defense counsel without objection elicited testimony about the investigation in his examination of Plaintiffs' witness.

Plaintiffs directly, and both sides realized they had been dealing with a fraudster impersonating each of them when dealing with the other. From June 2021 through December 2021, the fraudster collected $170,000 from FXCA and passed $60,000 of it back to Plaintiffs, depositing the difference of $110,000 into a bank account in the United States.

Around the same time this fraud started, Defendant He filed articles of incorporation with the California Secretary of State: for MetaQuotes Software Corp. (Plaintiff MSC's exact name) on June 12, 2021, and for FXCA Markets Limited (FXCA's exact name) on July 12, 2021. Neither company authorized He or anyone else to incorporate identically named companies in California. Defendant He was listed as the agent for service of process for both California companies, but each filing identified a different incorporator—Tomokazu Suzu for FXCA and Peijie Liu for MSC. Defendant He testified that he had no involvement in running the companies after he incorporated them and that he was acting on the instructions of Wen Peng Li, a person whom He claims never to have met or even seen on video. Defendant He claims that Li gave him a copy of Suzu's and Liu's passports to authenticate their status as officers of the companies, and He produced a copy of Suzu's passport as an exhibit. Although Suzu never authorized the incorporation of FXCA in California, "Peter" had requested Suzu's passport when setting up the licensing agreement for FXCA purportedly on behalf of MSC, and Suzu provided it to him.

After learning that someone was falsely claiming to be or to represent them, Plaintiffs began investigating and discovered the incorporations He had filed in California. Plaintiffs also reviewed their own records and found Defendant He's connections to their earlier concerns of fraudulent activity involving UGL and Qingdao Sitong. Plaintiffs filed this suit on March 28, 2022, alleging federal claims for (1) trademark infringement, (2) false designation of origin, and (3) false advertising and state law claims for (4) violation of the California Unfair Competition Law and (5) unjust enrichment. Dkt. No. 1. Plaintiffs name as Defendants not only He, but also Peijie Liu and three companies: the California MSC and FXCA entities that He incorporated and Standard Fintech Consulting, Inc. (Fintech), for which He claims to have been working when he incorporated the other companies.[2] *Id.* The Court granted Plaintiffs' request for an *ex parte* TRO

---

[2] Defendant He testified at the hearing that he was the sole employee of Fintech but did not own the company, and that he was fired after this case was filed. Although they have not focused their arguments on Fintech, Plaintiffs produced (1) a March 2020 email purporting to represent that Fintech was "owned by the same

that, among other things, enjoined Defendants from using Plaintiffs' trademarks, froze the assets of some Defendants, and required Defendants to produce limited expedited discovery. Dkt. No 18. The Court also ordered Defendants to show cause why a preliminary injunction should not issue.

Plaintiffs were unable to serve most Defendants, but Defendant He appeared and requested more time to respond.[3] The Court accordingly postponed the evidentiary hearing until April 22 and allowed Defendant He to file a surreply. Having considered the evidence and arguments of Plaintiffs and Defendant He, the Court now concludes that a preliminary injunction against He is warranted.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a preliminary injunction may issue where there are "serious questions going to the merits" and a "hardship balance that tips sharply toward the plaintiff," provided the other two elements of the *Winter* test are also met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Because of the extraordinary nature of injunctive relief and the potential for irreparable injury if it is not granted, a district court determining whether to issue a preliminary injunction may consider evidence outside the normal rules of evidence, including hearsay. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

---

shareholder" as UGL and warranting that Fintech would pay the license fees owed to MSC by UGL and (2) a June 2021 invoice from Fintech in Chinese, apparently charging fees related to both Plaintiffs' MT4 and MT5 trading platforms, even though the MT4 platform had been discontinued.

[3] Plaintiffs claim that they also served Fintech. The Court observed that the parties had focused their arguments on Defendant He and ordered that "[i]f Plaintiffs wish to seek injunctive relief directly against Fintech, the parties shall each file a supplemental brief no later than 9 a.m. on April 26, 2022" addressing whether injunctive relief against Fintech was justified. Dkt. No. 53 at 2. No such briefing was filed. Accordingly, the Court considers only Plaintiffs' claims against Defendant He in connection with the preliminary injunction.

### III.  DISCUSSION

The first factor, likelihood of success on the merits, is the most important *Winter* factor.  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  In their motion and at the hearing, Plaintiffs focused on the merits of their false designation of origin claim under the Lanham Act, 15 U.S.C. § 1125(a).  To be liable under § 1125(a), "a person must (1) use in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services."  *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007).  The evidence before the Court establishes that someone used an email address incorporating Plaintiffs' marks and used Plaintiffs' name and marks to forge a licensing agreement and invoices that purported to come from Plaintiffs.  The fraudster used Plaintiffs' marks in commerce to trick FXCA into paying money (much more than Plaintiffs would have charged) for access to Plaintiffs' software based on FXCA's mistaken belief that it was paying Plaintiffs.  The fraudster's unauthorized use of Plaintiffs' name and marks was likely to cause confusion, and in fact did cause actual confusion.  Plaintiffs have therefore shown that they are likely to succeed in proving a violation of § 1125(a).  The parties' central dispute is whether Plaintiffs can establish that the fraudster was Defendant He.

The circumstantial evidence strongly supports an inference that Defendant He was the fraudster who infringed Plaintiffs' trademarks.  The fraudster identified himself as Peter—a name Defendant He admits he has used in conducting business.  The fraudster corresponded with Plaintiffs using an IP address from Limassol, Cyprus, just as Defendant He had done previously.[4]  Defendant He had extensive experience interacting with Plaintiffs as a customer, giving him knowledge about Plaintiffs' billing practices that was not available to the general public.  The first invoice the fraudster sent to Suzu was on letterhead from "Fintech," which is the shortened name of Defendant Standard Fintech Consulting, Inc., for which Defendant He was the sole employee.  Defendant He obtained Suzu's passport around the same time that Suzu gave it to the fraudster.  And during the two months when the fraud began, Defendant He (purportedly on behalf

---

[4] Defendant He's contention that because he was in the United States, he could not have been the person using a Cyprus IP address is unpersuasive.  Defendant He was also in the United States during his earlier communications for UGL in which he used a Cyprus IP address.

of Fintech) incorporated two companies with names identical to the companies that were being defrauded through impersonation of each company to the other. He did this despite his established familiarity with MSC, including years of correspondence with MSC that ended when Plaintiffs cut off their license with UGL because they concluded UGL was engaged in fraud. Defendant He was personally aware of Plaintiffs' concerns about fraud, as he responded to those allegations in an attempt to persuade Plaintiffs not to terminate the licensing agreement with UGL. Under these circumstances, Defendant He's attempts to provide an innocent explanation for his lack of concern about incorporating new MSC and FXCA entities in California are not credible. The Court finds that Plaintiffs have shown that they are likely to succeed on their trademark infringement claim against Defendant He.[5]

Plaintiffs have also shown they are likely to be irreparably harmed by the continued infringement of their trademarks. Irreparable harm may not be presumed based solely on a likelihood of success in a trademark action, but evidence of loss of control over business reputation and damage to goodwill can constitute irreparable harm. *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Plaintiffs produce evidence that Defendant He successfully impersonated Plaintiffs to deceive and overcharge at least one of Plaintiffs' customers, FXCA. Plaintiffs' senior officer Fivos Gerogiades credibly testified, and the Court finds, that Defendant He's false claims to either be or represent Plaintiffs raise serious security concerns and threaten to confuse Plaintiffs' customers and undermine Plaintiffs' goodwill while depriving Plaintiffs of the opportunity to control their reputation. *See Feldenkrais Guild of N. Am. v. Wildman*, No. 18-CV-2340-YGR, 2018 WL 2331905, at *5 (N.D. Cal. May 23, 2018) (finding irreparable harm based on unauthorized use of plaintiff's mark because such use prevented plaintiff from controlling the quality of services associated with its marks and was likely to result in reputational harm and loss of goodwill). Indeed, the fraud was only discovered because FXCA reached out to

---

[5] This conclusion is further bolstered by Defendant He's central involvement in two separate companies that appear to have engaged in fraudulent conduct related to Plaintiffs' services and products, one of which ended in criminal prosecution. Although he claims to be unaware that he is wanted as a fugitive in China, Defendant He moved from China to the United States during the same month that the Chinese police identified him as a fugitive, and he has not returned since. However, the Court's conclusion would be the same even in the absence of these facts.

MSC with security concerns that arose from the software that was fraudulently provided to it. Because these harms are not readily compensable by an award of money damages, Plaintiffs have shown a likelihood of irreparable harm in the absence of an injunction.

Third, the balance of the equities favors Plaintiffs. Based on the evidence before the Court, Defendant He appears to have no legitimate basis for using Plaintiffs' trademarks and impersonating Plaintiffs to deceive customers. "[A] defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (cleaned up); *see also VidAngel*, 869 F.3d at 867 ("[H]arm caused by illegal conduct does not merit significant equitable protection."). Thus, any hardship to Defendant He caused by an injunction is heavily outweighed by the risk of irreparable harm Plaintiffs face if Defendant's infringement is not enjoined.

Finally, the public interest favors issuance of an injunction. "An injunction that prevents consumer confusion in trademark cases . . . serves the public interest." *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) (citing *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009)).

Because all four *Winter* factors favor Plaintiffs, a preliminary injunction enjoining further use of Plaintiffs' trademarks and impersonation of Plaintiffs is appropriate.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Rule 65(c) invests the district court with discretion as to the amount of security required. *Johnson*, 572 F.3d at 1086. To comply with the Court's order in the TRO, Plaintiffs deposited $50,000 into the registry of the Court on April 5, 2022. This deposit continues to provide appropriate security in the event that Defendant He is found to have been wrongfully enjoined, and no further deposit will be required.

The Court requested that the parties meet and confer to attempt to reach agreement on the appropriate scope of injunctive relief. The parties complied and submitted a proposed injunction to which Defendant He agrees in full as to form.

Dkt. No. 55. The Court appreciates the parties' cooperation and will adopt the proposed order.[6]

## IV. ORDER

The Court **GRANTS** Plaintiffs' request for a preliminary injunction as follows and hereby **ORDERS** that:

Defendant Jian He and any agents, employees, attorneys, and all persons in active concert with him are enjoined and restrained for the pendency of this action from:

1. Using Plaintiffs' METAQUOTES trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any products that are not a genuine version of Plaintiffs' products, services, or software;

2. Passing off or enabling others to pass off any products, services, or documents not produced by or under the authorization of Plaintiffs as genuine METAQUOTES products, services, or documents (including bills or invoices) produced by Plaintiffs;

3. Committing any acts calculated to cause consumers to believe that Defendant's products, services, software, marketing materials, or financial documents (including bills or invoices) are those sold or offered under the authorization, control, or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise associated with Plaintiffs; or

4. Further infringing Plaintiffs' METAQUOTES trademarks and damaging Plaintiffs' goodwill.

---

[6] Defendant He previously objected to the asset freeze, arguing that it was legally improper, in part because freezing all of He's assets was disproportionate to Plaintiffs' damages. Defendant He has not provided any information regarding the amount of his assets that have been frozen, and defense counsel represented to the Court at the April 8 hearing that he had no idea how much money was frozen. The parties made no further arguments about the asset freeze at the evidentiary hearing on April 22. This preliminary injunction is issued without prejudice to Defendant He later moving to modify or vacate the asset freeze. Any such motion must be supported by a detailed account of all frozen assets, including the amount of money in each account, and may be filed under seal.

It is further **ORDERED** that:

1. Defendant, Jian He, and any persons in active concert or participation with him or acting on his behalf, are restrained and enjoined during the pendency of this action from transferring or withdrawing of any money or other assets accessible to him, or that are owned or controlled by him, including, but not limited to assets held in a bank accounts or kept in safety deposit boxes with any bank or other similar institution.

    Notwithstanding this injunction, Jian He shall be permitted to make deposits, without limitation, into any bank account held by him.  In addition, Jian He may make one or more transfers, withdrawals, or disposals of amounts per month, which in the aggregate shall not exceed $8,000, for expenses.  For purposes of this Order, "per month" shall mean from the first day of a given calendar month until the last day of that calendar month, during which the total aggregate amount of assets that may be withdrawn, transferred, or disposed of shall not exceed $8,000.  In order to ensure compliance with this carve-out, Jian He must provide bank statements or other documentation reflecting amounts transferred or withdrawn by Mr. He from any other financial institution as of the date of this Order going forward, within three (3) business days if requested by Plaintiffs' counsel. Plaintiffs and Plaintiffs' counsel agree to keep all bank statements or other financial records received pursuant to this Order confidential and to destroy all such documents at the conclusion of this Action.

    Other than this limited carve-out for expenses, the preliminary injunction shall remain in full effect until the conclusion of this action, or until a further order of the Court is issued.

2. Any banks, savings and loan associations, payment processors, or other financial institutions for Defendant Jian He within two (2) business days of receipt of this Order shall:

    a. locate all accounts and funds connected to Defendant Jian He; and
    b. restrain and enjoin such accounts from, transferring, withdrawing, or disposing of any money or other assets from such accounts until expiration of this preliminary injunction or a further order of this Court is issued, except for the carve-out amount shown in section 1 above.

    c. Notwithstanding this Order including Section 2.b., Jian He shall be permitted to make deposits, without limitation, into any bank account held by him.

3. Any third party who is providing services for Defendant Jian He and receives notice of this Order, within five (5) business days after receiving notice shall provide to Plaintiffs the following expedited discovery:

    a. a statement describing the nature of Defendants' operations for which the third party is providing services and the nature of the services provided;

    b. identification of any bank accounts or other financial accounts owned or controlled by Defendants, including the account number and name of each account, of which the third party is aware;

    c. identification of any websites, addresses, and email addresses used by Defendants in connection with the operations for which the third party is providing services.

**IT IS SO ORDERED.**