UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| METAQUOTES LTD. et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>METAQUOTES SOFTWARE CORP.<br>et al.,<br><br>　　　Defendants. | Case No. 8:22-cv-00462-SB-DFM<br><br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

　　　Following the entry of default against all other Defendants, the only claims remaining for trial were Plaintiffs MetaQuotes Ltd. and MetaQuotes Software Corp.'s claims against Defendant Jian He.  The Court held a bench trial on April 24, 2023.  All three witnesses—Tomokazu Suzu, Fivos Georgiades, and Defendant He—previously testified at the April 22, 2022 evidentiary hearing on Plaintiffs' motion for a preliminary injunction.  To avoid redundancy, the Court accepted the parties' stipulation for the Court to receive the witnesses' prior testimony as if it were presented live at trial and to evaluate their testimony and make credibility determinations based on both the transcripts of their prior testimony and the additional testimony on direct and cross-examination at trial.  After evaluating the evidence at trial and considering the parties' written submissions, the Court issues the findings of fact and conclusions of law set forth below.[1]

---

[1] The characterization of a finding as one of "fact" or "law" is not controlling.  To the extent that a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

## FINDINGS OF FACT

### Plaintiffs

1.  Plaintiff MetaQuotes Software Corp. (MSC) is a corporation incorporated and headquartered in Cyprus.  Plaintiff MetaQuotes Ltd. (ML) is a related company incorporated and headquartered in the Bahamas.  Plaintiffs share the same management, directors, and CEO.

2.  Plaintiffs produce software for financial companies.  They have developed online trading platforms, which they license to brokers and end users around the world.

3.  Plaintiffs' products include the trading platforms MetaTrader 4, sometimes called MT4, and MetaTrader 5, sometimes called MT5.

4.  Plaintiffs' license agreements for their software and methods of charging their customers are not publicly available.

5.  At the end of 2020, ML acquired all intellectual property rights connected to MSC's software, and Plaintiffs have used ML to manage their operations since 2021, although MSC still has license agreements with some customers.

6.  ML owns several trademarks registered with the United States Patent and Trademark Office, including for "MetaQuotes," "MetaQuotes Software," "MetaTrader," "METATRADER," "MetaTrader5," "MT4," and "MT5."

7.  Defendant He does not dispute that ML's trademarks are valid and enforceable registered marks.

### Defendant Jian He

8.  From September 2017 to December 2020, Plaintiffs provided services to UGL Exchange Ltd. (UGL), a company registered in Cyprus.  Defendant Jian He was the sole shareholder of UGL and one of its directors, and he communicated regularly with MSC regarding billing and other matters.

9.  During his communications with MSC on behalf of UGL, Defendant He used an IP address associated with Limassol, Cyprus, even though Defendant He was in the United States at the time.

10.  In December 2020, Plaintiffs became concerned about fraud and other problems at UGL.  Plaintiffs asked to meet with Defendant He, but

2

Defendant He responded, using the email address peter@uglexchange.com, to state that he was stuck in America and could not travel to Cyprus. Plaintiffs, through counsel, then informed UGL that they were terminating the license agreement because UGL had repeatedly breached the terms of the agreement, including by providing Plaintiffs with forged documents, misrepresenting UGL's licensing status to the public, and engaging in fraud. Defendant He responded, again using the peter@uglexchange.com email address, to address these concerns, but Plaintiffs proceeded to terminate UGL's license.

11.   At the preliminary injunction hearing, Defendant He admitted that (1) he used the name "Peter" to do business, (2) Plaintiffs asked him to meet with them in Cyprus but he declined, and (3) he signed every page of the license agreement between Plaintiffs and UGL's predecessor. Defendant He denied that he used the peter@uglexchange.com email address or had seen the December 2020 emails produced by Plaintiffs, and he insisted that he was not involved in the running of UGL and was merely a shareholder with no right to operate the company.

12.   Considering the documentary evidence, Defendant He's admissions, and the Court's observations of his demeanor during his live testimony, the Court found after the preliminary injunction hearing—and again now finds—that Defendant He's denials lack credibility.

13.   Defendant He also played a central role in a second company that Plaintiffs concluded engaged in wrongdoing. In 2017, Plaintiffs investigated a company in China, Qingdao Sitong Software Co., Ltd. (Qingdao), for pirating Plaintiffs' software. At the preliminary injunction hearing, Defendant He testified that he set up Qingdao but sold his shares in October 2016, and he denied any involvement in wrongdoing that may have happened after that time.

14.   As part of their investigation into Qingdao, Plaintiffs were informed that Chinese law enforcement had arrested five people from the company and that the "boss," Defendant He, was a criminal fugitive who had evaded arrest and escaped overseas. Defendant He denied knowing about the criminal investigation, but he admitted at the preliminary injunction hearing that he came to the United States in August 2017, the same month the Chinese police identified him as a fugitive, and that he has remained here since.

15. At the pretrial conference, the Court granted Defendant He's motion to exclude evidence of the Chinese investigation. Consistent with the Court's ruling, Plaintiffs did not elicit such testimony at trial. However, Defendant He introduced the evidence he had sought to exclude by questioning Georgiades about the information he obtained from the Chinese investigation. The Court therefore considers this evidence, although it merely bolsters the conclusions that the Court would reach even in its absence.

<u>FXCA</u>

16. Tomokazu Suzu is the founder, owner, and CEO of FXCA Markets Limited (FXCA), a finance company incorporated in Hong Kong. Suzu resides in Taiwan, but FXCA's only office is in Hong Kong. FXCA has never had a presence in the United States or authorized anyone to incorporate an affiliate in the United States or to open a bank account for it in the United States.

17. In mid-2021, someone who identified himself as "Peter" and claimed to represent Plaintiffs reached out to FXCA attempting to sell Plaintiffs' software. Suzu was familiar with Plaintiffs and their software and decided to purchase a license.

18. The person who identified himself as "Peter" did not represent Plaintiffs. Plaintiffs were unaware of the fraudster or his communications with FXCA and did not authorize him to license Plaintiffs' software to FXCA.

19. Through correspondence with "Peter," FXCA entered into a licensing agreement purportedly with Plaintiff MSC in June 2021. The license agreement, which provided for FXCA's use of Plaintiffs' MetaTrader 5 software, contained the "MetaQuotes" mark on every page and purported to be signed by MSC's CEO.

20. The licensing agreement was not genuine. It included an $80,000 startup fee that Plaintiffs do not charge and that was written in red text, which Plaintiffs do not use in their contracts.

21. The person who created the licensing agreement obtained a genuine licensing agreement issued by Plaintiffs and then altered it before providing it to FXCA.

22.    In connection with the licensing agreement, FXCA received an initial invoice from "Fintech" for $147,700.[2]  As instructed, FXCA paid the invoice amount in Bitcoin to a U.S.-based JP Morgan Chase Bank account in the name of CitPay, Inc. (the 2628 Account).

23.    In the following months, FXCA received additional invoices purporting to be from MSC, in the total amount of $163,394.25.  The invoices were sent from the email address support@metaquotesmt5.com—an address and domain name that contains Plaintiffs' mark but that MSC does not use—and contained instructions to make payment to a JP Morgan Chase bank account in the United States.  As instructed, FXCA made payments totaling $163,394.25 to the designated bank account, which was held in the name of MSC (the 7033 Account).

24.    Each of the invoices FXCA received bore ML's trademarks and purported to be issued by Plaintiffs.

25.    The fraudster who pretended to represent Plaintiffs intentionally and willfully used ML's marks to deceive FXCA into believing that the FXCA was interacting with Plaintiffs.

26.    The use of ML's marks, together with altered versions of Plaintiffs' customer contracts, was likely to cause—and indeed did cause—consumer confusion as to the source of the contracts and the software being provided.

27.    Suzu personally participated in many of FXCA's interactions with the purported representative of MSC, although some of the interactions involved other employees acting at Suzu's direction.  In addition to "Peter," FXCA sometimes interacted with someone who self-identified as "Mia."

28.    Suzu never spoke to "Mia" on the phone, and there is no evidence that "Mia" is a real person distinct from the individual who claimed to be "Peter."

29.    Meanwhile, in July 2021, Plaintiffs were contacted by an individual purporting to be Suzu seeking to license Plaintiffs' product for use by FXCA.  Plaintiffs executed a license agreement with FXCA and provided credentialing to allow access to Plaintiffs' software.  For several months,

---

[2] All dollar amounts are in U.S. Dollars.

Plaintiffs sent invoices to the person who had contacted them on behalf of FXCA and received payment on the invoices.

30. The IP address used by the individual who reached out to Plaintiffs was associated with Limassol, Cyprus—like the IP address previously used by Defendant He in his earlier contacts with Plaintiffs on behalf of UGL. The real Suzu's IP address was associated with Taiwan, where Suzu resides.

31. Eventually, in December 2021, Suzu became concerned about difficulties accessing Plaintiffs' software. Suzu contacted Plaintiffs directly, and both sides realized they had been dealing with a fraudster impersonating each of them when dealing with the other.

32. From June 2021 through December 2021, the fraudster collected $311,094.25 from FXCA and paid $58,000 of it back to Plaintiffs, retaining the difference in bank accounts in the United States.

33. The fraudster's net profit from defrauding FXCA was $253,094.25.

<u>Defendant He's California Activity</u>

34. In the years leading up to the fraud on FXCA and while it was ongoing, Defendant He engaged in extensive activity in California connected to the businesses involved in the fraud.

35. On July 20, 2018, Defendant He filed articles of incorporation with the California Secretary of State for CitPay, Inc., designating himself as the person registered for service of process. The initial fraudulent invoice sent to FXCA directed it to make payment to an account in the name of CitPay, Inc.

36. On August 1, 2019, Defendant He filed articles of incorporation with the California Secretary of State for Standard FinTech Consulting, Inc. (SFC), designating himself as the person registered for service of process. The initial fraudulent invoice sent to FXCA purported to come from "Fintech."

37. On June 12, 2021 (around the same time the FXCA fraud began), Defendant He filed articles of incorporation with the California Secretary of State for MetaQuotes Software Corp. (Plaintiff MSC's exact name). The application named Peijie Liu as the incorporator.

38.  On July 12, 2021, Defendant He filed articles of incorporation with the California Secretary of State for FXCA Markets Limited (FXCA's exact name).  The filing listed Defendant He as the agent for service of process and identified Tomokazu Suzu as the incorporator.

39.  Defendant He admitted that he opened the 2628 bank Account in the name of CitPay, the 7033 Account in the name of MSC, and a JP Morgan Chase Bank account in the name of SFC.  Defendant He admitted that he had control of those bank accounts at some times, although he claims to have lost access.

40.  Neither MSC nor FXCA authorized He or anyone else to incorporate identically named companies in California or to open bank accounts in their names.

41.  Defendant He claims that he had no involvement in running the FXCA and MSC companies after he incorporated them in California and that he was acting on the instructions of Wen Peng Li.  Defendant He claims that he never met Li or even saw him on video.

42.  Defendant He claims that Li gave him a copy of Suzu's passport to authenticate Suzu's status as officers of the companies, and Defendant He produced a copy of Suzu's passport as an exhibit at the preliminary injunction hearing.

43.  Although Suzu never authorized the incorporation of FXCA in California, "Peter" had requested Suzu's passport when setting up the licensing agreement for FXCA purportedly on behalf of MSC, and Suzu provided it to him.

44.  In connection with the financial transactions at issue in the Court's civil contempt order for violation of the asset freeze, Defendant He claimed to have been acting largely on the instructions of Sumao Wang, the purported owner of SFC when incorporating the other companies and making financial transactions.

45.  Defendant He has not produced any evidence of correspondence with Peijie Liu, Wen Peng Li, or Sumao Wang.  For the reasons explained in the Court's January 12, 2023 order recounting its contempt findings, the Court concludes based on ample circumstantial evidence that Defendant He was untruthful in his testimony about Sumao Wang, among other things.  Dkt. No. 109.

46. It is not clear on this record whether Peijie Liu, Wen Peng Li, and Sumao Wang are real people. There is no credible evidence in the record that anyone other than Defendant He was involved in the California transactions involving CitPay, Inc., SFC, or the FXCA and MSC entities that Defendant He incorporated.

<u>Identity of the Fraudster</u>

47. The circumstantial evidence that Defendant He was the fraudster who impersonated Plaintiffs while interacting with FXCA and impersonated FXCA while interacting with Plaintiffs is overwhelming.

48. Defendant He had knowledge of Plaintiffs' services, including nonpublic information about their billing practices and terms of use, through his prior interactions with Plaintiffs on behalf of UGL.

49. Defendant He used the name "Peter" to do business while interacting with Plaintiffs.

50. The fraudster used the name "Peter" when interacting with FXCA.

51. Suzu provided a copy of his passport to "Peter" shortly before Defendant He provided a copy of Suzu's passport to the State of California while incorporating the company FXCA in California and listing Suzu as the incorporator.

52. The Cyprus-based IP address used by the fraudster to contact Plaintiffs while pretending to be FXCA was consistent with Defendant He's prior use of a Cyprus IP address while contacting Plaintiffs from the United States.

53. The fraudster sent FXCA an initial invoice from "Fintech" and directed FXCA to make payment to an account in the name of CitPay, Inc. Defendant He incorporated Standard FinTech Consulting, Inc. and CitPay, Inc. in California. Defendant He also opened and controlled the bank account to which the fraudster directed FXCA to make payment.

54. Defendant He admitted at trial that the money paid by FXCA to the fraudster was the same money that was deposited into the account he controlled.

55. The fraudster subsequently directed FXCA to make payments to a bank account in the name of MSC that Defendant He opened and controlled.

56.  The Court previously found by clear and convincing evidence that Defendant He knowingly violated the Court's asset freeze order by transferring more than $300,000 in and out of accounts he controlled, and that Defendant He's claim that Sumao Wang had made the transfers lacked credibility.  Dkt. No. 98.

57.  Defendant He provides no plausible innocent explanation for his unauthorized incorporation in California of two entities bearing the exact names of the two companies being defrauded—FXCA and MSC—at the same time that the fraudster began impersonating each of the two companies.

58.  Defendant He also provides no plausible explanation for why the fraudster, if not Defendant He or someone working with him, would have directed FXCA to send hundreds of thousands of dollars to the bank accounts that Defendant He had opened and that Defendant He controlled.

59.  Defendant He benefited from the fraudulent scheme by obtaining hundreds of thousands of dollars that were sent to the bank accounts he controlled.

60.  Both Defendant He's demeanor at trial and the questions he asked Suzu (for example, about the amount of work required to customize Plaintiffs' software and services for FXCA) suggested personal familiarity with the communications between the fraudster and FXCA.

61.  Based on the Court's observation of Defendant He at the preliminary injunction hearing and at trial, along with its prior findings by clear and convincing evidence that Defendant He gave untruthful testimony, the Court finds that Defendant He's testimony generally lacks credibility.

62.  The evidence before the Court overwhelmingly establishes that Defendant He perpetrated the fraudulent scheme to deceive Plaintiffs and FXCA. While the Court cannot exclude the possibility that others were also involved in the scheme, the Court finds that Defendant He was centrally involved and that any other participants were operating in cooperation with Defendant He.

<u>Plaintiffs' Investigation and Damages</u>

63.  After Suzu contacted Plaintiffs in December 2021 and they learned that someone was falsely claiming to be or to represent them, Plaintiffs began investigating the matter.

64.  As part of their investigation, Plaintiffs discovered the incorporations He had filed in California.  Plaintiffs also reviewed their own records and discovered Defendant He's connections to their earlier concerns of fraudulent activity involving UGL and Qingdao.  Plaintiffs concluded that Defendant He was involved in the fraudulent conduct.

65.  Plaintiffs filed this suit in March 2022, alleging federal claims for (1) trademark infringement, (2) false designation of origin, (3) false advertising, and claims under California law for (4) violation of the Unfair Competition Law (UCL) and (5) unjust enrichment.  Dkt. No. 1.

66.  In addition to Defendant He, Plaintiffs named as Defendants Peijie Liu, SFC, and the California FXCA and MSC entities incorporated by Defendant He.  None of the other Defendants have appeared, and Plaintiffs have obtained entry of default against the non-appearing Defendants.  Dkt. Nos. 64, 79, 80, 81.

67.  Over the course of more than a year of litigation, Plaintiffs sought and obtained a temporary restraining order, a preliminary injunction, and various remedies for Defendant He's civil contempt.  Plaintiffs have incurred more than $400,000 in attorney's fees litigating this matter.

68.  In addition to their litigation expenses in this matter, Plaintiffs have incurred costs investigating and attempting to mitigate Defendant He's fraud.

69.  Four of Plaintiffs' employees, including Georgiades, dedicated four weeks to investigating the fraudulent scheme.  Three of these employees have salaries of more than €100,000 per year.  The fourth has a salary of between €60,000 and €80,000.  Using the lowest salary figures, the four weeks of these four employees' time spent investigating the fraud cost Plaintiffs a minimum of €27,691.

70.  Plaintiffs also spent at least €18,000 to hire outside counsel to investigate the fraudulent scheme.

71.  Plaintiffs at present have no way of knowing whether Defendant He successfully defrauded other customers or potential customers of Plaintiffs in a similar manner.  Plaintiffs expect to reach out individually through sales personnel to each of their approximately 500 customers both to identify any such fraud and to assure their customers that their financial investments are safe.  Plaintiffs are justifiably concerned that, particularly given Plaintiffs' position in the financial sector, doubts about the security or reliability of

Plaintiffs' services will significantly harm their reputation and the goodwill they have established in the industry.

72.     Plaintiffs completed the planned corrective action with a random sample of 10 clients and 5 prospective clients.  They found that a minimum of two hours per client or potential client was required.  Thus, the anticipated corrective action will require at least 1,000 employee hours to contact all 500 customers.

73.     The salespeople who will conduct this corrective action are compensated at between €60,000 and €80,000 per year.  Taking the lowest figure and assuming 2,080 hours of work per year (40 hours per week for 52 weeks), 1,000 hours of corrective action will cost Plaintiffs €28,846.

74.     Plaintiffs' evidence at trial as to their investigation and remediation costs consisted entirely of figures in Euros, as reflected in the findings above. Plaintiffs did not introduce any evidence of the applicable conversion rate between Euros and U.S. Dollars (USD).  Plaintiffs' post-trial proposed findings of fact and conclusions of law provide approximate conversions to USD without identifying the relevant conversion rates or the times at which they were calculated.

75.     The Court takes judicial notice that the exchange rate between Euros and USD is not constant, and that during the relevant period from December 2021 (when Plaintiffs began investigating) to the present, it has ranged from a high of approximately 1.14 USD to 1 Euro to a low of approximately 0.96 USD to 1 Euro, with a current exchange rate of approximately 1.1 USD to 1 Euro.  Plaintiffs, who bear the burden to prove their damages, have not identified the precise timing of their expenditures or the exchange rates in effect at the time.  On this record, in the absence of contrary evidence, the Court will apply a conservative exchange rate of 1 USD to 1 Euro—near the lowest point during the relevant period—to Plaintiffs' past expenses, and an exchange rate of 1.1 USD to 1 Euro (the approximate current rate) for anticipated future expenses.

76.     Thus, the Court finds that Plaintiffs have spent $45,691 ($27,691 + $18,000) to investigate Defendant He's fraud and that they reasonably expect to spend an additional $31,731 for client outreach to remediate the reputational harm caused by Defendant He.

77.     Georgiades also testified that in the absence of the harm Defendant He caused to FXCA, Plaintiffs would expect that FXCA would have a larger budget and would be producing more revenue for Plaintiffs.  FXCA continues to be Plaintiffs' client, and in the absence of corresponding evidence from Suzu, the Court finds that any estimate of increased payments FXCA would have made to Plaintiffs but for Defendant He's fraud is too speculative to support an additional award of compensatory damages.

78.     The registration for MSC filed by Defendant He on the California Secretary of State's website has not been taken down.

79.     Plaintiffs' ability to protect their reputation has been harmed by Defendant He's conduct, and Plaintiffs will continue to suffer irreparable harm if Defendant He continues to use ML's marks and otherwise impersonate Plaintiffs.

<u>Allocation of Expenses and Profits</u>

80.     During the litigation of this action and through trial, the parties have largely treated Plaintiffs as interchangeable.  Plaintiffs provided testimony at trial about the expenses they have incurred and will incur in the future based on their own employees' salaries and payments to outside counsel, but they have not identified which Plaintiff has paid or will pay those costs.[3]

81.     The only material distinction between Plaintiffs on the record before the Court is that ML now owns the relevant trademarks and Plaintiffs have for

---

[3] Even after the Court requested post-trial briefing to address the distinctions between Plaintiffs, Plaintiffs continue to maintain that they are each entitled to recover damages and Defendant He's profits, apparently on the assumption that the two Plaintiffs would only seek to recover those damages and profits once.  Of course, each Plaintiff may only recover the damages it has incurred and the profits to which it would be entitled, and Plaintiffs cannot double-recover by each claiming entitlement to the same damages or profits.  Plaintiffs also do not appear to have considered the practical and legal problems raised by their approach.  For example, they have not addressed what would happen to MSC's award of damages and profits if the Court awarded the same damages and profits jointly to both Plaintiffs (as they request) and ML elected to receive statutory damages instead.  Ultimately, the Court finds it unnecessary to resolve this issue.  *See* discussion *infra*.

the most part used ML to run their business since 2021 (although MSC still maintains license agreements with some clients).  In the absence of any specific evidence about allocation of costs and expenses, the Court finds by a preponderance of the available evidence that the investigative costs incurred by Plaintiffs should be allocated to ML.  The Court therefore treats all past and future costs of investigation and corrective action as incurred by ML rather than MSC.

82.    Similarly, Plaintiffs produced no evidence indicating which Plaintiff would be entitled to recover Defendant He's fraudulently obtained profits.  In the absence of any other relevant evidence, the Court finds by a preponderance of the evidence that ML, the owner of the marks, would be the entity entitled to recover those profits.

## CONCLUSIONS OF LAW

### Count 1

1.    Count 1 alleges trademark infringement in violation of 15 U.S.C. § 1114.

2.    Because only Plaintiff ML owns the registered marks, Plaintiffs now concede that Plaintiff MSC cannot recover for trademark infringement in Count 1, and MSC affirmatively abandons its claim in Count 1.  Dkt. No. 164 at 3.

3.    To prevail on Count 1, ML must prove that it has a protectible ownership interest in a trademark and that Defendant He used the mark in a manner likely to cause consumer confusion.  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

4.    Defendant He does not dispute, and the Court finds, that ML has a protectable interest in its registered trademarks, including "MetaQuotes," "MetaQuotes Software," "MetaTrader," "MetaTrader5," "MT4," and "MT5."

5.    Defendant He used ML's registered marks, including "MetaQuotes," "MetaQuotes Software," "MetaTrader," "MetaTrader5," "MT4," and "MT5" in the documents he sent to FXCA.  Defendant He's use of ML's marks was likely to confuse and deceive FXCA into believing that it was corresponding with Plaintiffs.  Indeed, Defendant He intended to cause such confusion and succeeded in deceiving FXCA.

6.      Defendant He is liable to ML for trademark infringement.

<u>Count 2</u>

7.      Count 2 alleges false designation of origin in violation of 15 U.S.C. § <u>1125</u>, which imposes liability on "[a]ny person who, on or in connection with any goods or services" uses in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

8.      The analysis of liability under §§ 1114 and 1125 "is oftentimes identical." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 n.8 (9th Cir. 1999).  However, § <u>1125(a)</u> permits recovery not only by the registered owner of the mark but also by "any person who believes that he or she is or is likely to be damaged by" the defendant's false designation of origin.  Thus, "a nonowner with a cognizable interest in the allegedly infringed trademark" may bring claims under § 1125.  *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).

9.      To have standing to sue under § 1125(a), a plaintiff must show "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014).

10.     Even though MSC does not own the marks at issue, its commercial interest in controlling its business reputation was harmed when Defendant He fraudulently used the marks—including "MetaQuotes Software"—to impersonate Plaintiffs and deceive FXCA, requiring Plaintiffs to investigate the fraud and take corrective action to protect their reputation.  *Cf. Knature Co. v. Duc Heung Grp., Inc.*, No. 20-CV-3877-DMG, 2021 WL 2548679, at *6 (C.D. Cal. Apr. 22, 2021) (finding standing to sue under § 1125(a) because "[w]hile [plaintiff] may not own the . . . trademarks, its business still has a commercial interest in the brand's reputation as an entity that markets and sells branded products in the United States").  MSC lawfully uses the marks owned by ML and has a cognizable interest in the marks.  Moreover, some of Defendant He's conduct, including his registration of the fake MSC entity in California and his opening of a bank account in MSC's name (to which he directed FXCA to make payment), was specifically aimed at

14

impersonating MSC.  The continued existence of the California registration is an ongoing impediment to MSC's ability to control its reputation and ensure that its clients are not confused or deceived.

11. ML and MSC both have standing to sue for violation of § 1125.

12. Defendant He used ML's marks in commerce to falsely designate as coming from Plaintiffs his correspondence with FXCA and the forged licensing agreement and billing documents he sent to FXCA.

13. Defendant He's use of ML's marks was likely to deceive and actually did deceive FXCA, which believed it was interacting with Plaintiffs when purchasing Plaintiffs' software.

14. Defendant He is liable to Plaintiffs for false designation of origin in violation of § 1125.

Count 3

15. Count 3 alleges false advertising in violation of 15 U.S.C. § 1125, which imposes liability on "[a]ny person who, on or in connection with any goods or services" uses in commerce any "false or misleading representation of fact" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

16. As found above in connection with Count 2, both Plaintiffs have standing to bring claims under § 1125.

17. To prove a Lanham Act false advertising claim, Plaintiffs must show:  (1) a false statement of fact by Defendant He in a commercial advertisement about his own or another's product; (2) that the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) that the deception was material; (4) that Defendant He caused his false statement to enter interstate or international commerce; and (5) that Plaintiffs have been or are likely to be injured as a result of the false statement.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

18. Defendant He made false statements to FXCA when he claimed to represent Plaintiffs in order to persuade FXCA to enter into a licensing agreement.

For example, the doctored licensing agreement claimed to be "entered by . . . **MetaQuotes Software Corp**" through its director Renat Fatkhullin.

19. Defendant He's false statements actually deceived FXCA—his audience. FXCA believed it was interacting with Plaintiffs when purchasing Plaintiffs' software.

20. Defendant He's deception was material. FXCA would not have paid Defendant He more than $300,000 for a software license if it had realized that Defendant He did not in fact represent Plaintiffs.

21. Defendant He, who resides in the United States, transmitted his false statements through interstate and international commerce by emailing Suzu and other FXCA employees in Taiwan and Hong Kong.

22. Plaintiffs were injured by Defendant He's false statement. They lost control of their reputation and incurred expenses investigating the fraud and attempting to mitigate its impact.

23. Defendant He is liable to Plaintiffs for false advertising in violation of the Lanham Act.

<u>Count 4</u>

24. Count 4 alleges violation of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq*.

25. "The UCL is a broad California statute that prohibits business practices that constitute 'unfair competition,' which is defined as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising,'" along with certain designated statutory violations. *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013).

26. The Ninth Circuit "has consistently held that . . . actions pursuant to [the UCL] are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). Thus, "violations of the Lanham Act . . . can serve as a predicate basis for a claim of unlawful and unfair practices under the UCL." *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, No. 20-CV-06957, 2021 WL 1253803, at \*7 (N.D. Cal. Apr. 5, 2021).

27.    Defendant He's impersonation of Plaintiffs described above constitutes an unlawful, unfair, and fraudulent business practice in violation of the UCL.

<u>Count 5</u>

28.    Count 5 alleges unjust enrichment.

29.    "In California, '[t]here is no cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust.'" *Myers-Armstrong v. Actavis Totowa, LLC*, 382 F. App'x 545, 548 (9th Cir. 2010) (quoting *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006)).

30.    Because unjust enrichment is not an independent cause of action, Plaintiffs' claim in Count 5 is dismissed. *See Knuttel v. Omaze, Inc.*, No. 2:21-CV-09034-SB, 2022 WL 1843138, at *13 (C.D. Cal. Feb. 22, 2022) ("Omaze correctly argues that Plaintiffs' unjust enrichment claim should be dismissed because California does not recognize a cause of action for unjust enrichment.").

<u>Defendant He's Defenses</u>

31.    At various times throughout these proceedings, including in his answer, Defendant He has invoked the first sale doctrine. Defendant He argues that the fraudster (who he claims not to be) was merely acting as a middleman and that Plaintiffs were not harmed because they gained a customer and received income from FXCA as a result of the transaction.

32.    The first sale doctrine provides that "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act. When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995).

33.    "The reason behind the rule 'is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.'" *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d

1083, 1085 (9th Cir. 1998) (quoting *NEC Elecs. v. CAL Cir. Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987)).

34.  Defendant He has not shown that Plaintiffs' software licenses are products that can be purchased and resold within the ambit of the first sale doctrine. But even assuming that they are, Defendant He did not merely resell the license.  To the contrary, he pretended to be Plaintiffs when interacting with FXCA.  Moreover, he altered the license agreement to raise the price and include terms not offered by Plaintiffs.

35.  Defendant He's actions were intended to deceive and succeeded in deceiving FXCA.  His fraudulent conduct went far beyond merely reselling a genuine product.  Defendant He cites no authorities suggesting that the first sale doctrine applies in these circumstances.

36.  The first sale doctrine does not permit Defendant He's fraudulent conduct or shield him from liability.

37.  Defendant He's argument that Plaintiffs were not harmed is likewise unavailing.  If accepted, it would lead to an absurd result—that fraudsters would be free to impersonate legitimate businesses and defraud their customers so long as they pass along a portion of the proceeds to the businesses they impersonate.  Such a rule is incompatible with the purposes of trademark protection.  "Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners.  Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control.  A trademark owner's loss of the ability to control its marks, thus, creates the potential for damage to its reputation." *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal.) (citations omitted), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

38.  Plaintiffs have produced evidence that Defendant He's fraud threatens Plaintiffs' reputation in the industry.  Plaintiffs have also produced evidence of quantifiable harm in the form of investigative costs and remedial measures they must take in response to Defendant He's fraud.  Defendant He therefore has not shown that his conduct did not harm Plaintiffs.

39.  To the extent Defendant He asserts a defense of fair use, he has not shown that his fraudulent impersonation of Plaintiffs was fair.

<u>Damages – 15 U.S.C. § 1117(a) and (b)</u>

40.    Plaintiffs seek to recover actual damages, profits wrongfully obtained by Defendant He, statutory damages, treble damages, attorneys' fees, and interest.[4]

41.    The Lanham Act permits a prevailing plaintiff to recover "(1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § <u>1117(a)</u>.  "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case," provided that the damages "shall constitute compensation and not a penalty."  *Id*.

42.    Section 1117 "confers a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the Act."  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (quoting *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968)).

43.    "The district court assesses 'any damages sustained by the plaintiff' in the same manner as in tort damages:  the reasonably foreseeable harms caused by the wrong."  *Id*. at 1112.  The damages calculation does not require "empirical quantification" or expert testimony; rather, the court may use "crude" measures of damages based upon reasonable inferences.  *Id*. at 1112–13.

44.    Based on the Court's finding by a preponderance of the evidence on this limited record that Defendant He's profits and Plaintiffs' expenses should be allocated to ML rather than MSC, MSC has not shown that it is entitled to recover any damages or profits under § 1117(a).

---

[4] The prayer for relief in Plaintiffs' complaint also requests "punitive damages to the fullest extent available under the law."  Dkt. No. <u>1</u> at 26.  Plaintiffs identify no legal basis for awarding punitive damages as a remedy for any of their causes of action, nor does their proposed judgment seek an award of punitive damages. Plaintiffs have not shown that they are entitled to punitive damages.

45.   ML is entitled to recover Defendant He's profits from defrauding FXCA through the infringement of ML's trademarks in the amount of $253,094.25.

46.   ML's actual damages consist of its costs already incurred investigating Defendant He's infringement in the amount of $45,691, as well as its actual damages for future corrective action in the amount of $31,731, for total actual damages of $77,422.

47.   The Court finds that Plaintiffs' request for an additional $150,000 in actual damages based on their expectation that FXCA would likely have generated more profits absent Defendant He's actions is speculative, and the Court declines to award additional actual damages on this basis.

48.   In cases involving the use of a counterfeit mark in commerce, in violation of § 1114(1)(a), "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—(1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services . . . ." 15 U.S.C. § 1117(b).

49.   Because the enhanced damages in § 1117(b) apply only to the trademark infringement claim in Count 1, Plaintiffs concede that only ML, and not MSC, may obtain damages under § 1117(b).  Additionally, because the Court allocates all expenses and profits to ML, there is no damages or profit award for MSC that could be enhanced under § 1117(b).

50.   Defendant He intentionally used counterfeit marks in commerce in connection with the sale and offering for sale of services when he sent FXCA a doctored contract for the licensing of Plaintiffs' software and invoices bearing ML's marks and purporting to be from Plaintiffs. *See* 15 U.S.C. § 1116(d)(1)(B) (defining "counterfeit mark" to include "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered").

51.   The Court does not find extenuating circumstances to depart from the requirements of § 1117(b).

52. Accordingly, § 1117(b) entitles ML to recover from Defendant He $759,282.75 (three times Defendant He's profits, which are greater than ML's actual damages).

53. The impact of an award of treble profits or damages under § 1117(b) on an award of profits, damages, and costs under § 1117(a) is not entirely clear from the statutory language. On the one hand, § 1117(a) provides that a prevailing plaintiff "shall be entitled . . . to recover (1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," and § 1117(b) instructs how to "assess[] damages under subsection (a)" in cases involving use of a counterfeit mark, suggesting that the treble multiplier should be applied as part of the total recovery under subsection (a). On the other hand, § 1117(b) instructs the Court to "enter judgment for three times [Defendant's] profits or [Plaintiffs'] damages, whichever amount is greater, together with a reasonable attorney's fee." The "enter judgment" language in isolation most naturally suggests that subsection (b) provides the total judgment amount to be awarded in cases of counterfeiting, such that subsection (b), where applicable, supersedes subsection (a).

54. Although the Court is unaware of any cases discussing this possible tension in the statutory language, it appears that courts have uniformly applied § 1117(b) to permit recovery of both profits and damages under § 1117(a) even when the larger sum is trebled under § 1117(b). *Deckers Outdoor Corp. v. Ego Shoes Ltd.*, No. 20-CV-11351-MWF, 2021 WL 5933111, at *3 (C.D. Cal. Nov. 19, 2021) (awarding treble damages plus profits); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. C 04-4146 MMC, 2007 WL 328696, at *14 (N.D. Cal. Feb. 2, 2007) (same); *Choice Hotels Int'l, Inc. v. Frontier Hotels, Inc.*, No. CV H-15-2355, 2018 WL 2317604, at *3 (S.D. Tex. May 22, 2018) (awarding treble profits plus damages); *Ne. Lumber Mfrs. Ass'n v. N. States Pallet Co.*, No. 09-CV-290-LM, 2011 WL 320619, at *7 (D.N.H. Jan. 31, 2011) (same).

55. The decisions of these courts are consistent with a plausible reading of the "enter judgment" language in § 1117(b) as describing only a portion of the judgment being entered, rather than indicating that the entire judgment must be limited to the relief described in § 1117(b). Moreover, reading the "enter judgment" language to preclude any relief beyond treble profits or damages and attorney's fees seemingly would foreclose injunctive relief in a judgment entered pursuant to § 1117(b)—a result arguably in tension with § 1116.

56. The Court noted in its May 5, 2023 order that "[n]either side has addressed whether Plaintiffs may recover both treble lost profits and actual damages under § 1117(b)" and invited both sides to file supplemental briefs on this question. Dkt. No. 163 at 2. Defendant He did not file a supplemental brief, nor has he otherwise made any argument or identified any legal authority disputing Plaintiffs' position on this matter.

57. In the absence of any contrary argument by Defendant He, the Court will follow the uniform approach of the courts cited above, which is at least consistent with a plausible reading of § 1117, and will allow Plaintiff ML to recover under both § 1117(a) and (b).

58. Accordingly, in addition to the treble profits in the amount of $759,282.75 to which ML is entitled under § 1117(b), ML is also entitled to recover its actual damages in the amount of $77,422, for a total of $836,704.75.

59. In cases involving counterfeiting, § 1117(b) also permits, but does not require, the court to award prejudgment interest on the amount of the judgment.

60. Plaintiffs have not offered any argument as to why the Court should exercise its discretion to award prejudgment interest in this case. In the absence of an adequate showing by Plaintiffs that the requested interest is appropriate on this record, the Court declines to award prejudgment interest.

### Attorney's Fees

61. Section 1117(a) provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The award of fees is in the discretion of the district court. *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir. 1984). "A trademark case is exceptional for purposes of an award of attorneys' fees where the infringement is malicious, fraudulent, deliberate or willful." *Id*.

62. Section 1117(b) requires an award of reasonable attorney's fees "unless the court finds extenuating circumstances." As stated above, the Court does not find extenuating circumstances to depart from the requirements of § 1117(b).

63. Defendant He's infringement of ML's marks and his impersonation of Plaintiffs was fraudulent, deliberate, and willful. This case is therefore "exceptional" within the meaning of § 1117(a), and the Court will exercise its discretion to award attorney's fees.

64. Accordingly, both Plaintiffs are entitled to recover their reasonable attorneys' under § 1117(a), and Plaintiff ML is additionally entitled to recover the same under § 1117(b).

65. The amount of Plaintiffs' reasonable attorney's fees shall be determined after Plaintiffs file a separate motion for attorney's fees supported by billing documentation and evidence of the reasonableness of their fees.

<u>Statutory Damages – 15 U.S.C. § 1117(c)</u>

66. In cases of counterfeiting, the Lanham Act allows plaintiffs to elect to recover statutory damages in lieu of the actual damages, lost profits, and other remedies provided in § 1117(a) and (b).  15 U.S.C. § 1117(c).  A plaintiff who elects to recover statutory damages under § 1117(c) is not entitled to recover attorney's fees under § 1117(b).  *K & N Eng'g, Inc. v. Bulat*, 510 F.3d 1079, 1082 (9th Cir. 2007).

67. In its May 5, 2023 order for supplemental briefing, the Court stated that "[a]ny claim or remedy not asserted in [Plaintiff's] brief shall be deemed abandoned as to Plaintiff MSC only."  Dkt. No. 163.  Plaintiffs' supplemental brief does not address statutory damages under § 1117(c), so MSC's claim for statutory damages is deemed abandoned, and the Court assesses statutory damages only as to ML.

68. If the court finds that a defendant's use of a counterfeit mark was willful, it may award statutory damages in the amount of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(c).  The court has "wide discretion" in determining the amount of statutory damages to award.  *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) (interpreting similar provision in Copyright Act); *Seiko Epson Corp. v. Koshkalda*, 799 F. App'x 463, 466 (9th Cir. 2019) (quoting *Columbia Pictures* when affirming exercise of court's discretion to award statutory damages under Lanham Act).

69. Defendant He's use of counterfeit marks to impersonate Plaintiffs when interacting with FXCA was willful.

70. ML seeks an award of $2 million in statutory damages based on a proposed finding that Defendant He used counterfeit marks "in more than 10 instances."  Dkt. No. 161-1.  ML does not address the measure used in

23

§ 1117(c) to define the maximum statutory damages:  how many counterfeit marks Defendant He used "per type of goods or services sold, offered for sale, or distributed."

71.   ML has only proven that Defendant He used the counterfeit marks in connection with one type of goods or services sold or offered for sale: licensing of Plaintiffs' software.  Defendant He used at least six distinct counterfeit registered marks in the documents he sent to FXCA: "MetaQuotes," "MetaQuotes Software," "MetaTrader," "MetaTrader5," "MT4," and "MT5."  Based on his willful use of these counterfeit marks, the Court has discretion to award up to a maximum of $12 million in statutory damages.

72.   To the extent Defendant He may have used additional counterfeit marks in the same correspondence, that would not alter the Court's assessment of the appropriate total statutory damages based on the same conduct by Defendant He.

73.   The Court does not find that the maximum statutory damages of $12 million or ML's requested award of $2 million are warranted here.  To be sure, Defendant He's conduct was egregious.  But the same is true in many, if not most, cases of willful infringement using counterfeit marks, and the limited scope of Defendant He's proven infringement does not justify a maximum award.  The number of counterfeit marks used (at least six) overstates the actual impact of Defendant He's fraud.  Plaintiffs have shown only that Defendant He impersonated Plaintiffs in his interactions with a single customer, FXCA.  The multiple distinct marks that Defendant He counterfeited were contained in the same doctored contract and related billing documents.  And ML's requested statutory damage award of $2 million—let alone the $12 million maximum award allowed under the Lanham Act—is disproportionate to ML's actual damages of $77,422 and Defendant He's profits of $253,094.25.

74.   Considering all the circumstances, including the factors noted in the previous paragraph, the Court concludes that an award of statutory damages in the amount of $750,000, which equates to approximately three times Defendant He's illicit profits, is just and appropriate.

75.   If ML elects to recover statutory damages, it shall be entitled to an award of $750,000.

Restitution

76.   In addition to damages under the Lanham Act, Plaintiffs' complaint seeks restitution as a remedy for their UCL claim.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) ("A UCL action is equitable in nature; damages cannot be recovered. . . . "[P]revailing plaintiffs are generally limited to injunctive relief and restitution.").

77.   In their supplemental brief, Plaintiffs concede that "because Plaintiffs did not pay money to Defendant, UCL restitution is not available," and "the only remedy available to Plaintiffs under the UCL is a permanent injunction." Dkt. No. 164 at 7; *see also Korea Supply Co.*, 29 Cal. 4th at 1152 ("We hold that nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL.").

78.   Accordingly, Plaintiffs are not entitled to restitution under the UCL.

Injunctive Relief

79.   The Lanham Act permits courts "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office."  15 U.S.C. § 1116(a).

80.   The UCL also allows prevailing plaintiffs to obtain injunctive relief.  Cal. Bus. & Prof. Code § 17203 ("Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.").

81.   Plaintiffs request that the Court permanently enjoin Defendant He and his agents and associates from using ML's marks; passing off products, services, and documents as produced or authorized by Plaintiffs; causing consumers to believe that Defendants' products, services, or documents are sold by or under the authorization of Plaintiffs; and otherwise infringing Plaintiffs' marks and damaging their goodwill.

82.   Plaintiffs' requested injunction would effectively continue on a permanent basis the first part of the preliminary injunction now in effect under the Court's April 27, 2022 order.  Dkt. No. 57.

83.   "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. Natural Res. Def.*

25

*Council, Inc.*, 555 U.S. 7, 32 (2008).  The party seeking a permanent injunction must show:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013).

84. Plaintiffs have proven that Defendant He willfully infringed their trademarks as part of a scheme to impersonate Plaintiffs and defraud Plaintiffs' customer.  Defendant He's conduct has caused irreparable injury to Plaintiffs' ability to control their reputation, impeding their ability to assure their customers in the financial industry that Plaintiffs and their software can be trusted.  *See Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.").

85. The threat that Defendant He may repeat his fraudulent conduct cannot be adequately remedied by monetary damages.  In the absence of an injunction, Plaintiffs are likely to be exposed to further irreparable reputational harm.

86. The balance of hardships weighs heavily in favor of Plaintiffs.  Defendant He has no legitimate interest in remaining free to willfully infringe ML's trademark, whereas Plaintiffs have a strong interest in being protected from Defendant He's illegal conduct.  *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) ("[H]arm caused by illegal conduct does not merit significant equitable protection.").

87. The public interest is served by a preliminary injunction that prohibits Defendant He from continuing to violate ML's trademark rights and defraud Plaintiffs' customers and potential customers by impersonating Plaintiffs.  *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in trademark cases . . . serves the public interest." (citing *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009)).

88. Accordingly, the Court finds that Defendant He should be permanently enjoined from infringing ML's trademarks and otherwise deceiving the public by impersonating or claiming a false association with Plaintiffs.

89.  The terms of the injunction, which continue the prohibitions in place under the preliminary injunction, are described in the disposition below.  The Court finds these terms reasonable and necessary to protect Plaintiffs from irreparable harm.

## Takedown Order

90.  Finally, Plaintiffs request in their proposed judgment that the Court order Defendant He to remove from all publicly available sources the counterfeit corporate entities he created in California when he filed certificates of incorporation for FXCA and MSC.

91.  Plaintiffs have not provided any argument or authority in connection with this request.  It is unclear whether they seek an order compelling Defendant He to seek cancellation of the entities he incorporated, or if there is other action Plaintiffs contemplate.  Nor is it clear whether Defendant He is opposed to the action Plaintiffs seek.  And while the registration of a fraudulent FXCA entity in California may harm FXCA, Plaintiffs have not explained why they have standing to seek cancellation of that entity, which does not use their trademarks.  Moreover, Plaintiffs have not yet obtained default judgements against the California FXCA and MSC entities, both of which are named as Defendants, and both of which (to the extent they are not merely instrumentalities of Defendant He) have the greatest interest in the remedy Plaintiffs seek.

92.  For all these reasons, the Court denies Plaintiffs' request at this time, without prejudice to Plaintiffs seeking similar relief in connection with their motions for default judgment against Defendants FXCA and MSC.  Any such request must be supported by legal authority.

## DISPOSITION

In light of the above-stated findings of fact and conclusions of law, the Court finds that Plaintiff MetaQuotes Ltd. is entitled to recover from Defendant He its actual damages in the amount of $77,422 and treble profits in the amount of $759,282.75, for a total of $836,704.75.  In the alternative, Plaintiff MetaQuotes Ltd. may elect to recover statutory damages in the amount of $750,000.  Plaintiff MetaQuotes Ltd. shall file a notice within seven days after entry of this order indicating its election.

Both Plaintiffs are jointly entitled to recover their reasonable attorney's fees in an amount to be determined.

Plaintiffs are also entitled to a permanent injunction restraining Defendant He Defendant Jian He, his agents, employees, and attorneys, and all persons in active concert with him from:

1. Using Plaintiff MetaQuotes Ltd.'s registered trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any products that are not a genuine version of Plaintiffs' products, services, or software;

2. Passing off or enabling others to pass off any products, services, or documents not produced by or under the authorization of Plaintiffs as genuine MetaQuotes products, services, or documents (including bills or invoices) produced by Plaintiffs;

3. Committing any acts calculated to cause consumers to believe that Defendant's products, services, software, marketing materials, or financial documents (including bills or invoices) are those sold or offered under the authorization, control, or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise associated with Plaintiffs; or

4. Further infringing Plaintiff MetaQuotes Ltd.'s trademarks and damaging Plaintiffs' goodwill.

All other relief sought in Plaintiffs' claims against Defendant He is DENIED.

Plaintiffs have obtained clerk's entries of default against the remaining Defendants, and the Court previously indicated that it would allow Plaintiffs an opportunity to move for default judgment after resolution of their claims against Defendant He.[5]  Dkt. No. 90.  A final judgment cannot be entered until Plaintiffs' outstanding claims are resolved.  Accordingly, it is ORDERED that Plaintiffs within 14 days after entry of this order shall file as to each remaining Defendant

---

[5] In their proposed judgment, Plaintiffs mistakenly assert that they have already obtained default judgments against the non-appearing Defendants.  Because they have not, their request to apply the relief obtained against Defendant He against the other Defendants is premature.

either a properly supported motion for default judgment or a statement that Plaintiffs no longer intend to prosecute their claims against that Defendant.  In any such motion, Plaintiffs shall take care to identify which Plaintiff asserts entitlement to recover under which claims and to identify the basis for any requested relief as to each Plaintiff seeking it.  Failure to do so may result in summary denial.

The Court defers consideration of the amount of Plaintiffs' attorney's fee award until after Plaintiffs' claims against the other Defendants have been resolved through voluntary dismissal or default judgment, which may bear on whether any other Defendants shall be jointly and severally liable with Defendant He and whether Plaintiffs are entitled to recover attorney's fees incurred in prosecuting their claims against the other Defendants, to the extent such disaggregation is possible.   Plaintiffs shall file a noticed motion for attorney's fees within 7 days after resolution of their claims against the defaulting Defendants, unless the Court orders otherwise.

Date: May 17, 2023

_____
Stanley Blumenfeld, Jr.
United States District Judge